# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:06CR353 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | |
| DAVID SANTANA-AGUIRRE, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant David Santana-Aguirre (Santana-Aguirre) (Filing No. 36). Santana-Aguirre is charged in the Indictment along with co-defendant Julian Arana-Santibanez (Arana-Santibanez) with a conspiracy to distribute and possess with intent to distribute over 500 grams of methamphetamine (Count I) in violation of 21 U.S.C. § 846 and the possession with intent to distribute more than 500 grams of methamphetamine (Count II) in violation of 21 U.S.C. § 841(a)(1) (Filing No. 1).

Santana-Aguirre seeks to suppress evidence obtained by the Nebraska State Patrol (NSP) on October 17, 2006, following the detention of Santana-Aguirre and Arana-Santibanez at the Greyhound Bus Depot in Omaha, Nebraska. An evidentiary hearing was held on Santana-Aguirre's motion on March 5, 2007. Santana-Aguirre was present in person with his counsel, Assistant Federal Public Defender Jeffrey L. Thomas, and the government was represented by Assistant U.S. Attorney Jennie Dugan-Hinrichs. Chandler Thompson, a certified interpreter in the Spanish language, served as the interpreter by remote telephone hook-up. Also, Dr. Jeck Naverrete, a Spanish Language interpreter for the Office of the Federal Public Defender, was present during the testimony of the NSP Investigators. During the hearing, the court heard the testimony of NSP Investigators Richard Lutter (Investigator Lutter) and Alan L. Eberle, Jr. (Investigator Eberle). The court also received into evidence an NSP Advice of Rights form in Spanish (Exhibit 1) with an English translation (Exhibit 1A). A transcript of the hearing (TR.) was filed on March 15, 2007 (Filing No. 54).

# FINDINGS OF FACT

The NSP Commercial Interdiction Unit (CIU) watches for drug couriers using commercial forms of transportation, including airports, bus stations, and train stations (TR. 3-4). On the morning of October 17, 2006, Investigators Lutter and Eberle were assigned to the NSP CIU at the Omaha Greyhound bus terminal (TR. 3-4; 41). Investigator Eberle arrived at the bus terminal around 5:00 a.m. and observed incoming buses which had originated from the west coast (TR. 41). While observing passengers off-load from the bus, Investigator Eberle's attention was drawn to a male individual who was clasping a suitcase tight to his body and appeared nervous (TR. 41). This person was holding the suitcase up underneath his armpit and holding it with his hand (TR. 42). Investigator Eberle described the suitcase as a medium sized suitcase, black and green in color, and having the dimensions of 24 to 26 inches tall, 14 inches wide, and 6 to 8 inches deep (TR. 42). Investigator Eberle noted this individual met another individual on the west side of the bus terminal, set the suitcase down close to his own feet, and began conversing with another male (TR. 41). As he conversed with the other male, the male with the suitcase kept looking over his shoulder and seemed to be overly nervous (TR. 43). Investigator Eberle identified the individual with the suitcase as the defendant Santana-Aguirre and the other individual as Arana-Santibanez (TR. 43 - 44).

After a brief conversation between themselves, Arana-Santibanez began walking toward the front of the terminal with Santana-Aguirre following closely behind (TR. 45 - 46). As they turned the corner to walk to the front of the terminal, Investigator Lutter arrived at the front of the terminal and noticed the two walking in single file (TR. 5; 47). Investigator Eberle made a hand gesture to Investigator Lutter indicating that Investigator Eberle was interested in approaching the two individuals (TR. 47). Investigator Lutter approached Santana-Aguirre and Investigator Eberle approached Arana-Santibanez (TR. 48). These contacts took place within four to six feet of another (TR. 49). Separately and in the English language, Investigator Lutter informed Santana-Aguirre and Investigator Eberle informed Arana-Santibanez that they were police officers and displayed their badges and identification cards (TR. 9; 48). Both Santana-Aguirre and Arana-Santibanez were separately informed they were not in any kind of trouble or under arrest, but the officers wished to speak with them (TR. 10; 48). Santana-Aguirre did not appear to understand English and Investigator Lutter repeated his opening comments in Spanish (TR. 11). When

2

Investigator Eberle heard Investigator Lutter address Santana-Aguirre in Spanish, Investigator Eberle began to address Arana-Santibanez in Spanish, whereupon Arana-Santibanez told Investigator Eberle that he (Arana-Santibanez) spoke English (TR. 48). Investigator Eberle then continued to converse with Arana-Santibanez in English (TR. 48).

Investigator Lutter learned Command Spanish through a law enforcement training course, through the use of tapes, and experience in the field (TR. 25). In Spanish, Investigator Lutter asked Santana-Aguirre if he understood, and Santana-Aguirre nodded in the affirmative and also answered "yes" to the Spanish word "Comprendo" (TR. 12). At no time during their conversation did Santana-Aguirre indicate or tell Investigator Lutter that Santana-Aguirre did not understand Investigator Lutter's limited Spanish (TR. 25). Investigator Lutter continued to converse with Santana-Aguirre in Spanish and asked Santana-Aguirre for identification (TR. 12). Santana-Aguirre nodded and reached into his pocket for identification (TR. 12). Investigator Lutter asked if he (Investigator Lutter) could see the identification (TR. 12). Santana-Aguirre handed Investigator Lutter the identification (TR. 12). Investigator Lutter was suspicious of the authenticity of the identification, but handed it back to Santana-Aguirre (TR. 13). Investigator Lutter asked Santana-Aguirre for his bus ticket, and Santana-Aguirre handed Investigator Lutter the bus ticket (TR. 13). Investigator Lutter noted the bus ticket was purchased for cash, purchased on the date of departure, and purchased at Colorado Springs, Colorado for travel to Omaha (TR. 13). Investigator Lutter returned the ticket to Santana-Aguirre and asked him if he had any illegal substances on him (TR. 14). Santana-Aguirre stated no (TR. 14).

Investigator Lutter then asked Santana-Aguirre if Investigator Lutter could search Santana-Aguirre's person and bag (TR. 14). Santana-Aguirre reacted in an affirmative manner by turning to and facing Investigator Lutter and opening his hands (TR. 14). Investigator Lutter patted Santana-Aguirre down and then asked Santana-Aguirre if Investigator Lutter could search the bag (TR. 14). Santana-Aguirre responded by opening his hand to Investigator Lutter, pointing to the bag as if opening the bag (TR. 15). Investigator Lutter opened the bag and found two wax candles (TR. 15). Investigator Lutter believed the candles to be suspicious in that they were very large, about the size of a gallon coffee can, and very plain (TR. 15). Investigator Lutter opined that the candles were unusual to be carried about in luggage since they were plain and not a high dollar candle (TR. 15). Investigator Lutter began to examine the candles more closely and found the

layering of the candles to be inconsistent (TR. 16). There were bumps separating the different layers of the candles (TR. 16). The candles did not appear to remain in their original packaging, and the lettering on the packaging appeared to be torn with after-marketing tape securing the packaging (TR. 16). Investigator Lutter observed holes around the wick area of the candle (TR. 16). Investigator Lutter noted that Investigator Eberle was talking with Arana-Santibanez in English and Arana-Santibanez appeared to be very interested in the contact with Santana-Aguirre, so Investigator Lutter asked Arana-Santibanez where the candles had come from (TR. 16). Arana-Santibanez said they (Santana-Aguirre and Arana-Santibanez) had brought them with them as gifts (TR. 16). During this time, Santana-Aguirre appeared to be very nervous and seemed to be looking to Arana-Santibanez for direction (TR. 17). Investigator Lutter told Arana-Santibanez that the officers would like to take the candles to the back room of the bus terminal (TR. 17). Investigator Lutter led the way followed by Santana-Aguirre and Arana-Santibanez with Investigator Eberle trailing (TR. 18).

The back room of the bus terminal is a luggage area that has shelves for luggage and parcels (TR. 18). The room is fourteen feet wide and twenty feet long (TR. 18). There are several luggage carts, a copy machine, and exits to the main ticket area and to the parking area of the terminal (TR. 19). Upon arrival in the room, Investigator Lutter cut into one of the candles with his knife and discovered a duct-taped bundle in the candle (TR. 19). The substance was field tested and proved positive for methamphetamine (TR. 21). Thereupon, Investigator Lutter informed Santana-Aguirre in Spanish and Arana-Santibanez in English that they were under arrest for possession of a controlled substance (TR. 20). The evidence was then collected by the Investigators and both Santana-Aguirre and Arana-Santibanez were transported to the NSP traffic office in west Omaha where each was placed in a separate room (TR. 21).

Investigator Lutter interviewed Santana-Aguirre by employing another NSP officer, Trooper John Coover who spoke fluent Spanish, as a translator with Santana-Aguirre (TR. 22). Santana-Aguirre was read his *Miranda* rights by Trooper Coover by means of a Spanish language advice of rights form (Exhibit 1) which Santana-Aguirre acknowledged and signed (TR. 22-23; Exhibit 1). The parties stipulated that Exhibit 1A is an accurate English translation of Exhibit 1 (TR. 57). During the interview, Santana-Aguirre made various incriminatory statements with regard to the candles seized (TR. 24).

# LEGAL ANALYSIS

## A. Investigator Lutter's Contact with Santana-Aguirre

Encounters between the police and citizens fall into three general categories:

(1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment, **see, e.g., *Florida v. Bostick*,** 501 U.S. 429 (1991); ***Florida v. Royer***, 460 U.S. 491 (1983); ***United States v. Tarantola***, 332 F.3d 498, 499 (8th Cir. 2003); ***United States v. Jones***, 269 F.3d 919, 925-26 (8th Cir. 2001); ***United States v. Hathcock***, 103 F.3d 715, 718-19 (8th Cir. 1997); ***United States v. Robinson***, 984 F.2d 911, 913 (8th Cir. 1993);

(2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity, **see, e.g., *United States v. Sokolow*,** 490 U.S. 1 (1989); ***Reid v. Georgia***, 448 U.S. 438 (1980); ***Terry v. Ohio***, 392 U.S. 1 (1968); ***United States v. Maltais***, 403 F.3d 550, 554 (8th Cir. 2005); ***United States v. Bustos-Torres,*** 396 F.3d 935, 942 (8th Cir. 2005); and

(3) physical arrests, which must be supported by probable cause. ***U.S. Const. amend. IV.***

The issue is whether the initial contact between Investigator Lutter and Santana-Aguirre was a purely consensual encounter or an investigatory detention or seizure. "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." ***Terry***, 392 U.S. at 19 n.16. A seizure does not occur when a police officer approaches an individual and merely questions him or asks to examine his identification -- so long as the officer does not convey a message that compliance with his request is required. ***Bostick***, 501 U.S. at 434; **see also *United States v. Drayton***, 536 U.S. 194, 200-01 (2002). If "a reasonable person would feel free 'to disregard the police and go about his business,'" the encounter is consensual and no reasonable suspicion is required. ***Id***. (**quoting *California v. Hodari D.***, 499 U.S. 621, 628 (1991)). "It is well established that law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place . . . [and] putting questions to him if the person is willing to listen." ***United States v. Green***, 52 F.3d 194, 198 (8th Cir. 1995) (citations omitted). A request for information does not turn consensual questioning into an

investigatory stop. **United States v. Pena-Saiz**, 161 F.3d 1175, 1177 (8th Cir. 1998); **United States v. Poitier**, 818 F.2d 679, 682-83 (8th Cir. 1987). Further, as long as a defendant was not selected for an approach for any purely discriminatory reasons, e.g., race or ethnicity, the fact law enforcement chose to approach a particular defendant is without constitutional implication. No such invidious selection occurred in this incident.

The government has the burden to prove the initial encounter was voluntary, or that justification otherwise existed for each increasingly intrusive restraint on the defendant. See **Missouri v. Seibert**, 542 U.S. 600, 609 n.1 (2004); **United States v. Escobar**, 389 F.3d 781, 785 (8th Cir. 2004) ("The government bears the burden of showing consent was freely and voluntary given and not a result of duress or coercion, and the burden cannot be discharged by showing mere acquiescence to a claim of lawful authority."). "The determination of which police-citizen contacts fall within the regulation of the Fourth Amendment and which do not is a fact intensive one which turns upon the unique facts of each case." **Jones**, 269 F.3d at 925.

An investigative detention must be supported by a reasonable articulable suspicion of criminal activity.

> [The Eighth Circuit] has summarized the standards used to consider whether reasonable suspicion exists as follows:
>> The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warranted suspicion that a crime was being committed. In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. The totality of the circumstances -- the whole picture -- must be taken into account. We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, however, the officers must be acting on facts

> directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which describe a very broad category of predominantly innocent [people].

*United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) (internal citations and quotations omitted); **see also** *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000). Recently, the Supreme Court has held "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124. The court noted that even where all of the suspect's conduct is lawful, if the conduct is ambiguous and susceptible to an innocent explanation as well as creating a reasonable suspicion of criminal activity, police officers may detain the individual to resolve the ambiguity. *Id.* at 125.

### B. Consent to Search by Santana-Aguirre

Santana-Aguirre gave Investigator Lutter consent to search his person and bag. The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996). A court may also look at environmental factors including, the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while the search occurred. *Id.*; *United States v. Contreras*, 372 F.3d 974, 977 (8th Cir. 2004). "The government bears the burden of proving voluntary consent [to search] by a preponderance of evidence." *United States v. Galvan-Muro*, 141 F.3d 904, 907 (8th Cir. 1998).

"The relevant inquiry is whether the facts available would have justified a reasonable officer in the belief that the consenting party had authority over the [property]." *Id.* Further, consent may be reasonably implied from behavior, rather than solely verbal affirmance. *United States v. Williams*, 346 F.3d 796, 799 (8th Cir. 2003) (consent to entry found where individual opened door wide and stepped aside); **see also** *United States v. Mendoza-Cepeda*, 250 F.3d 626, 627- 629 (8th Cir. 2001) (finding law enforcement reasonably viewed the defendant's gestures as consent to a search); *United States v.*

7

*Jones*, 254 F.3d 692, 695 (8th Cir. 2001) (consent to search person found where defendant opened and raised his arms with palms up).

In the present case, no evidence suggests Santana-Aguirre was threatened, intimidated, or promised anything in return for giving his consent to search his person or bag. In addition to verbal consent, Santana-Aguirre gestured to indicate consent to search his person and bag.

### C.  Detention of Santana-Aguirre

Santana-Aguirre accompanied Investigator Lutter to the back room of the bus terminal where Investigator Lutter used a knife to cut into the candles. While Investigator Lutter pointed to the back room area and Santana-Aguirre followed, the court does not consider that Santana-Aguirre voluntarily accompanied the investigators. Clearly, Santana-Aguirre was detained for the purposes of the Fourth Amendment. However, Investigator Lutter validly detained both Santana-Aguirre and Arana-Santibanez after discovering the candles in Santana-Aguirre's luggage. Investigator Lutter amassed reasonable suspicion to believe the two individuals were involved in drug trafficking and detained them while investigating further in the back room of the bus terminal." *Terry*, 392 U.S. at 19.

Once the packaging of the powdery substance was found in the candles and field tested for methamphetamine, Investigator Lutter had probable cause to arrest Santana-Aguirre and Arana-Santibanez.

### D.  Statements by Santana-Aguirre

Santana-Aguirre was advised of his *Miranda* rights and seeks to suppress such statements as the fruit of an illegal search of his bag and his arrest. Since the court has found the Santana-Aguirre's detention and arrest to be lawful, accordingly, there is no poison tree under *Wong Sun v. United States*, 371 U.S. 471 (1963). Santana-Aguirre's statements are admissible against him if they were voluntary.

The court must look to the totality of circumstances in determining whether or not the statements were voluntary. *Mincey v. Arizona*, 437 U.S. 385 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). In this case, Santana-Aguirre was advised of his constitutional rights in Spanish pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). There is no evidence Santana-Aguirre did not

8

understand the advice of rights. There is no evidence that Santana-Aguirre was subjected to improper interrogation tactics or that his statements were coerced. The court finds Santana-Aguirre's statements to be voluntarily made.

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Santana-Aguirre's motion to suppress (Filing No. 36) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 13th day of April, 2007.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge